Good afternoon, Your Honors, and may it please the Court, John Hacker for Appellants Exxon Shipping Company and Exxon Mobil Corporation. I'm going to try to reserve five minutes for rebuttal. Today's proceeding presents two issues concerning the content of the mandate to be issued by this Court, one issue raised by Exxon and one issue raised by Plaintiffs. First, Exxon asks that the mandate include an award of appellate costs to Exxon since Exxon prevailed in obtaining 90 percent of the relief it sought on appeal. Can I have a second? Yes, sir. I didn't understand in the briefs the distinction from Planned Parenthood. Maybe if you explain it orally, I'll understand it. Well, there's several distinctions, I would say. I would say, first of all, in Planned Parenthood, it's not a question of interest. I can see distinctions, but I don't understand why they make a difference in terms of what the – Are we talking about interest or cost? Yeah. That issue goes to interest, which I was going to address second, but I'm happy to answer the question now. Are you going to address it whenever you like? I will get to that. That's my question for you. Yeah, Brian, I look forward to answering it. If you want to talk to something else, I may just forget about it before you do. No, no. I promise I will answer it. Let me begin with costs, though, because that's sort of our motion, if you will. Costs, I have a question, too. Please. Why shouldn't it be 90 percent instead of 100 percent? Well, we don't disagree. We would accept – we think 90 percent would be not an unreasonable allocation under these circumstances because when the appellate proceedings began, Exxon faced a potential punitive damages liability of $5 billion. To exercise its right to challenge the lawfulness of that award on appeal, Exxon was forced to – required to file a letter of credit securing the entire $5 billion judgment. That letter, of course, came with substantial costs in terms of interest over the appellate period. But it protected your assets. That's correct. That's correct. We're not saying – to execute on the judgment and the assets. So you did get a benefit from that because if they had executed on the judgment, you'd be out the money. Right. We're not saying that there was no – that we should not have been required to file one. We're simply saying that that was a consequence, a requirement to exercise our rights to challenge the lawfulness on appeal, which we – and we pointed out to plaintiffs that we – you know, we asked that we not be required to file it. Plaintiffs insisted that we file it. To treat the – you know, insisted on treating the case like a normal case, and that's essentially all we ask for now. And it's not a normal case because your client has so many resources? Is that – is that the difference? Well, we think it's an unusual case, but it is a normal case in that Exxon prevailed by attaining 90 percent of the relief that it sought on appeal. When the appellate proceedings began, we faced $5 billion in potential liability. At the end of the proceedings, we had an award that was 10 percent, or 90 percent less than the original award. And for centuries, the law has recognized a strong presumption favoring an award of cost to the party that prevails in a legal proceeding. That presumption is now codified in Civil Rule 54 for trial proceedings and for appellate proceedings in Appellate Rule 39. Under that one rule – Well, why isn't this really a mixed judgment, though? I mean, you didn't prevail on all issues. And the ordinary case in front of us, before us, if one party wins some and one party loses some, that's a mixed judgment up to the Court's discretion. Why do you think we should depart from that? We agree that it's a mixed judgment governed by Rule 39a-4 so that it's not required that we obtain cost. We think the Court ought to exercise its discretion to award cost under these circumstances because the standard this Court has employed in circumstances like this isn't simply in any mixed case where one party wins most of everything, but another party wins a little bit, costs are automatically – each party automatically bears its own costs. Instead, the standard is when a party substantially or primarily prevails, that party is deemed the prevailing party for purposes of the appeal. Well, you owe the plaintiffs a lot of money. Yes. And you fought very hard for the principle that you should not be liable at all. And punitive damages. And to now say, well, the case was really all about just the amount of damages seems to me something of a distortion, because we all spend a lot of time and effort and money debating the issue of whether or not damages were appropriate at all. Well, two answers, Your Honor. Two points. First of all, it is true that at the end of the day we owe the plaintiffs roughly $500 million. That's why the plaintiffs are the prevailing parties in the district court. They started out with an entitlement to zero and established that they are, at the end of the day, entitled to $500 million. Nobody would contend they didn't prevail in the district court. But by the same token, remember, they were seeking $20 billion and didn't get the rest of that. And that doesn't mean they didn't prevail. And by analogy, it's the same point here. On appeal, we began with a potential liability of $5 billion. At the end of the appeal, we owe 90 percent less than that. Counsel, I can't remember right now what the Federal provision is. In Alaska, what we used to do is routinely make offers of judgment. And that would turn the loser into the winner automatically. No more discretion. So if you're being sued and you make an offer of judgment for more than you ultimately lose by, you're the winner. And there's nothing like that here, right? Right. Yeah. That only operates when you have an offer of judgment situation. The question here is simply under Rule 39.84. And there was no offer of judgment, right? Not to my knowledge. So this is just purely a matter of our Rule 39, our Fract 39 discretion. Right. And as I understand it, an offer of judgment goes to the amount, the ultimate amount. If there had been an offer of judgment of $400 million and they'd obtained $500 million, they'd only be entitled to $400 million, something like that. This is purely the issue we're discussing right now. It just addressed the appellate cost. It's important to distinguish the appellate costs from costs in the trial court because you don't have offer of judgment, right? Yeah. But I don't think it matters because there was none made, correct? That's to my knowledge, there was no offer of judgment made. And that's not an argument that we're resting on here. What we're resting on here is a convention that when we started the appeal, we owed essentially or we faced potential liability for $5 billion and now owe 90 percent less than that, which is substantially and primarily appealing within the context of the appellate proceeding. Now, the plaintiffs argue that despite that, that there are for four equitable factors, four equitable reasons, this Court ought not exercise its discretion under 3094 and grant Exxon its appellate costs or even 90 percent of its appellate costs that were required to incur in order to exercise its appellate rights. But upon closer inspection, all of those factors actually militate in favor of awarding of costs to the party that is deemed prevailing at the end of the legal proceeding. The first factor is the importance of the case. While here it was Exxon that through its appeal set an extremely important national precedent which would protect American shipping commerce from excessive monetary liability and will likely bring greater rationality to the administration of punitive damages in other cases. The second factor is whether the issues were close and complex. Here, even on the issues on which Exxon did not prevail, to your point, Judge Schroeder, the questions were very close. Exxon came very nearly prevailed in erasing the entire jury verdict. The Supreme Court split four to four on the vicarious punishment issue. And this Court itself acknowledged the strength of Exxon's argument that the Clean Water Act precluded punitive damages altogether. And on the issue on which Exxon did prevail, the size of the award, the issue was never close. This Court itself held that the award was unlawful by $2.5 billion, and no justice of the Supreme Court suggested that an award of $5 billion was anywhere close to a lawful amount. In fact, the Court denied without comment plaintiff's cross petition for certiorari seeking to restore the award to $5 billion. The third factor, an important one, is economic disparity between the parties. And plaintiffs' reports point to the disparity between Exxon and individual class members. But the Supreme Court in this very case specifically held that the award here has to be considered on a class-wide basis. These are the Court's words. In a class action where large numbers of potential plaintiffs are involved, individual awards are not the touchstone, for it is the class option that facilitates suit. And a class recovery of more than $500 million is substantial, given that substantial recovery. Alito, usually these cases are much smaller, so we just make discretionary judgments and it isn't worth anybody's money to argue about them. This one's big, so we have an argument. That's right. I'm familiar with the Seventh Circuit case in Republic-something, Republic Tobacco. Yes. I'm not aware that there's a Ninth Circuit precedent that tells us exactly what to do here. Is there? Well, there wouldn't be one that tells you exactly what to do, because as we conceded, it's a question in each case what the equities compel. But in the Cooper v. Leatherman case, the Court did what we're suggesting here. Now, it's true that that was a different case involving different numbers, but that gets to the fourth point I was going to make, which is the fourth equity factor the plaintiffs point to is the costs are unusually large, which is true that that's an important equitable factor. But here, that's all the more reason you shouldn't penalize the party that so successfully could deal with them. But the odds to see the odd thing here is that when you started out, you didn't have all the Supreme Court law in your favor, so that by bearing the costs of keeping the appeal going, you really got the benefit of a lot of changing law. So it's not as if you were, you know, from the very beginning fighting a battle where you would be vindicated because the law was so clearly in your favor. So I'm not sure how the equities lay in quite the way that you would like to characterize them. It's a very interesting problem. I understand. And I would suggest that, I mean, I'm not aware of precedent that sort of parses the party's entitlement at the end of a case based on developments in the law, you know, in the interim like that. But the general idea of your, of who should bear the costs equitably in this case, it's kind of a different situation. Well, I think it's different only in the sense that, you know, you're talking about a very unusual, unusually large cost that are, indeed, a consequence of the fact that the appeal is unusually large. Well, you're talking about the area of punitive damages generally, which has been a very shifting field. Right. But you're also talking, if I may, about a case that's unique because of the unusual size of the award. Right. You know, enormous, and the unusual length of time it took to reach the end of the appellate proceedings. So you've got 12 years of appellate proceedings and a bond that's securing variously $5 billion to $2.5 billion over the period of time. And so the main equitable question, though, I think, you know, I've gone through and I think tried to demonstrate that the factors the plaintiffs point to, if anything, cut in favor of applying the traditional presumption. But I think the most important equitable factor is as other courts do. Well, you talk about the traditional presumption, but that's only on the prevailing party. I mean, thinking back onto my practice, it's very rare in a case of a mixed judgment that I, that each party hasn't borne its own costs at least on panels I've been on. I can think of maybe two in which it was just a trivial point in which one party prevailed. But that wouldn't be the standard presumption, at least as far as my operation. I don't think we apply a presumption in the circuit that if you win most of your arguments, you get your costs. You want to turn to me. Do I turn to interest questions? I actually don't understand why you focused on the importance of the issues and the arguments you won instead of the amount of money. Well, I mean, that is, that is the, that's the ultimate equity I was going to get to simply was that you're penalizing the party that was so successful in exercising its own rights. The best argument is you won 90 percent relief. I'm sorry? Your best argument is you won 90 percent relief. Yes. I agree with that. That's why. All I'm saying is what the plaintiffs have argued is despite the fact that we won 90 percent of the relief, the plaintiffs say there are four reasons that nevertheless the Court shouldn't exercise discretion. And my submission is that those factors actually favor an award here. But let me do turn to the interest question, going back to Judge Kleinfeld's where we started. The Court's authority to award interest in this case on the final $507.5 million award is controlled in the first instance by Appellate Rule 37b, which provides that if the Court modifies or reverses a judgment with the direction that a money judgment be entered in the district court, the mandate must contain instructions about the allowance of interest. That provision contrasts with Rule 37a, which provides that where a money judgment is simply affirmed, quote, whatever interest is allowable by law is paid from the date of the district judgment. Unlike that language, Rule 37b does not require either that interest be paid from any particular date or that the rate be whatever is, quote, allowable by law. Instead, when an appellate court directs the entry of new or modified monetary judgment below, the plain terms of Rule 37b allow the appellate court to dictate the interest applicable to the new award. Now, plaintiffs here contend that interest should date back to the original $5 billion punitive damages judgment as if that judgment had actually awarded a lawful $507.5 million amount on that date in order to compensate them for hypothetical loss of the use of that amount during the appellate period. We submit that that basic theory is inconsistent with the public purposes of punitive damages, which are to deter future misconduct. Alito. I had asked you a question at the outset of argument, and you said I don't want to answer it now. I'll get to it later. Are you going to at some point? I'll answer it right now. That's the Planned Parenthood I was just getting to, that point of the argument about Planned Parenthood. Planned Parenthood did award interest dating back to the original award. We suggest it's distinguishable on two bases, but I don't want to belabor the legal distinction. In Planned Parenthood, first of all, the Court treated punitive damages partly compensatory, and we know that that's not the way punitive damages are supposed to be treated in this case. The Supreme Court has instructed otherwise. And in Planned Parenthood, the underlying the award was factually and legally valid under the underlying law, and the Court simply applied already existing recognized constitutional standards. Are you saying that we should not distinguish Planned Parenthood? We should treat it as overruled by subsequent Supreme Court decision? No. No. No. No.  I'm saying it's different because in this case, this no court applied maritime standards, there weren't any maritime standards to apply to the award. The first court that ascertained the lawful amount was the Supreme Court when it announced a maritime standard and applied it to this case. But I don't understand why the maritime standard matters, because 1961, 28 U.S.C., 1961 appears to speak to judgments regardless of whether they're ordinary civil cases or maritime cases. Well, and that's such an important point because plaintiffs rest their argument on the text of 1961 as if it's 1961 that controls, and we don't think Planned Parenthood holds that. What Planned Parenthood holds is that because a judgment was earlier ascertained, the Court in that case would allow the plaintiffs, the interest to date back to the original judgment, but that can't be required as a matter of 1961. That can't be what the text of the statute requires, because the Supreme Court's decision in the Briggs case, and this Court's decision in Planned Parenthood itself, squarely held that an appellate court has the power to deny interest outright, to deny interest outright on a new or modified monetary award. In fact, the Briggs dissent made exactly, exactly the argument plaintiffs were making here, that 1961's predecessor statute required that interest on a money judgment directed by the appellate court date back to the original district court award, despite the terms of the appellate mandate. The Briggs majority flatly rejected that argument and said no, it is the appellate mandate that controls the interest award, not the district court interest statute. So if 1961 doesn't control of its own force, and the appellate court has the greater power to deny interest altogether, then we would submit that even assuming there's an ascertainment under Planned Parenthood and other cases, whether you accept that legal argument or not, this Court has the discretion to decide what the appropriate interest rate ought to be, that it ought to exercise the power that exists under Rule 39a, excuse me, Rule 37b, as interpreted in Briggs, as interpreted in Planned Parenthood, and prescribe an interest rate that accurately reflects the compensation the plaintiffs were seeking here. Remember, that's the reason they believe there ought to be interest dating back to 1996, to compensate them for the hypothetical. Kennedy. 1961 was amended, and the later version does not apply here. It's not retroactive. I think we're together so far, right? That's right. Go through the words of 1961 as it was in effect at the relevant time, and show me where we get this discretion that you're speaking of. Well, 1961, I can tell you from 1961, the discretion, I'm arguing, comes from Rule 37b and Planned Parenthood. 1961, we know it can't operate its own terms, because if said then, I don't have the exact language here, but interest shall be allowed on any money judgment. Well, here there's three or four money judgments below, and so it can't be 1961 doesn't tell you which money judgment is required. I don't get it. The only money judgment interest could possibly be allowed on is the one that wasn't vacated. It's the final. It will be the final judgment at the end of this case. Yes. Right. And so 1961 isn't doing any work here. It's this Court's mandate telling the parties in the Court what interest should be. The others don't exist. Once they're vacated, they don't exist. That's correct. So it says interest shall be allowed. It says shall instead of may, so it's mandatory. And then it says it shall be calculated, that means must, not may, from the date of entry of the judgment. And then it says what the rate is. And now it says the weekly one year. Back then it used a different formula. The earlier judgment has been vacated. It doesn't exist anymore. So the only way that interest can run back to that is under this Court's power under Rule 37. But your argument is not just timing. It's amount. Right. And where in the record would we set that amount from? Well, we've submitted declarations that aren't contested by plaintiffs that represent a more accurate, as Judge Schroeder said, in the Sevedo v. Korean Airlines case, the most accurate way to compensate plaintiffs for the loss of use of money is through a fluctuating interest rate. Nobody contends. The plaintiffs aren't going to stand up and say, No, we haven't agreed on what the rate is. Is it accurate? No. But, I mean, we haven't. We don't have expert testimony or any findings on that. If we choose now to depart from the words that Congress has used and we've employed, then really we're going to have to do this in every single case. Two answers to that. First of all, what we're suggesting are two rates this Court has used. It doesn't mean unbounded discretion. It means discretion to use logical rates. This Court has used them. They're familiar from the prejudgment interest context. This is not an unusual method. And the second point is, this is an unusual case, Your Honor. In most cases, you don't have a judgment this large, $500 million at the end of the period of time, over 12 years, and a delta, a gap this large between the actual real world interest rate, the fluctuating rate, and the fixed rate that would otherwise be applied. That's the problem here. Sure we do. I remember it in the 70s when the rates were going up instead of down. In fact, if I recall correctly, that's why we've got all these statutes that have the fancy adjustment provisions. Right. We used to have a fixed 10 percent. But this is still very unusual in terms of the size of the case and the amount of time. Why is it going to make any difference analytically? Well, because the equity issue. I mean, you say it's a large case, so it takes a lot of time. Because what you have then is vast overpunishment and overcompensation. If you don't award – if you award interest at a 5.9 percent rate, you inflate the value of the punitive damages award by about 200 million beyond what it would be if it had actually been on plaintiff's theory. Remember, plaintiff's premises, they should be given punitive damages today that are what $507.5 million would have been worth on September 24th, 1996. If you apply the 5.9 percent rate, they get an award that's about $200 million more than that. And that's the reason this is an unusual case that you shouldn't apply a 5.9 percent. But in the vast minority of cases, it makes perfect sense to go ahead and apply the 5.9 – the 1961 rate as has normally been applied. You have used your time.  May it please the Court, I'm Jeff Fisher here representing the plaintiffs today. The reality is, with respect to both interest and cost, we're asking the Court to do nothing more than apply its recent decision in Planned Parenthood. In that case, the Court confronted a $108 million punitive damage judgment that it    million dollars. That was a 96 percent reduction in that award. This Court held that the plaintiffs were entitled to recover interest to the date of the original judgment and that each party was required to bear its own costs. And Planned Parenthood is consistent with case after case in this Court and, indeed, with the uniform precedent of all other circuit courts in the country. Counsel, I don't have much trouble with what you say about the interest from Planned Parenthood. But on the cost, of course, we have discretion. And I'm having some difficulty following why we should treat it as though nobody really won. I'm quite sure that after the Supreme Court made its decision, the victory parties were at Exxon's office, not at the plaintiff's attorney's offices. No victory parties after that decision on the plaintiff's side. As a practical matter, nobody really cares about all the legal arguments and amiable Nancy and all that unless the arguments enable them to win. Now, when I look at the money, what strikes me on this case is that all the costs that matter here because of what they had to pay to post the supersedious bonds. If they had not posted the supersedious bonds, they could not have preserved the money while they appealed. That was entirely under the control of the plaintiff. You had a defendant as far from judgment-proof as it's possible to get. Absolutely no risk that you couldn't get your money at the end of the case, no matter what it turned out to be. Now, since you take the option, of course, there's plenty of reason even in that situation to require a supersedious bond. They may go bankrupt like Texaco because they don't have the cash, puts a lot of money on supersedious bonds. There's settlement discussion, all kinds of reasons. But nevertheless, totally the plaintiff's control to make them spend all that money on the supersedious bonds, $60 million or $70 million on supersedious bonds. And as a practical matter, the case was all about money, and they got most of the money wiped out. I don't see why they shouldn't get 90 percent of what it cost them to post those supersedious bonds. They got rid of 90 percent of the money. There's a lot there, Judge Kleinfeld. Let me start with... I wanted to lay out my thinking for you... Thank you. ...so you could really address it. Thank you. Let me start with the precedent, and then I'll explain why it makes sense to follow precedent in this case. And I just want to remind the Court where I stopped off that in Planned Parenthood with a 96 percent reduction, in Southern Union with a 98 percent reduction, in the Baines case, which, Judge Kleinfeld, I believe you were on the panel on, with an over 90 percent equivalent or greater reductions, this Court has held that the parties should bear their own costs. And so why does that make sense, and why should you not deviate from that here? Well, first... Bower and Baines, I happen to recall, since I was on it, cost didn't amount to anything. It was the usual sort of thing. It was just nickels and dimes. Well, first, as a matter of practicalities, as you put it, let me say that the plaintiffs did achieve a great deal in this case, Judge Kleinfeld. The punitive damage judgment that this Court has now confirmed is one of the handful largest ever in a Federal court. The battle, as Judge Schroeder was speaking earlier, over liability in the first place was a very difficult one, and one that we were, as you would put it, very pleased to prevail on, and a very meaningful victory in this case. And then as a matter of applying that to the bond, it was not solely our choice as to whether to get a bond, although I would emphasize that we do have a fiduciary duty to the class in this case. And so, especially in light of current economic events, I think it is quite clear why we had to do everything we could to secure the judgment and make sure that money would be there in the event of prevailing. But even with respect to Exxon's own volition, Exxon had a couple of choices if it didn't want to pay for a bond. One is it could have paid the money into the district court, and it chose not to do that. And there's a good reason why Exxon chose not to do that, because by keeping the money, Exxon was able to capitalize on its own internal rate of return. Over the 12 years in which this appeal has been going on, Exxon has made $4.4 billion on the $507 million that they should have paid the plaintiffs in 1996. So we hardly think it's unfair for Exxon. Pardon me? How do you figure that? I don't understand. Just simply using the numbers that Exxon publishes every year of its internal rate of return on capital, which are public documents, we have a chart that's attached to our answering brief. It's Exhibit A, Your Honor. By that chart, we lay out how Exxon has capitalized to the extent of $4.4 billion. Now, we seek to recoup one-ninth of that for our interest. Does that internal rate include things like this? I would think that for something like this, a business would have to set aside a reserve. I think Exxon had the option to do that, but did not because, as it says, it was flushed, so to speak. So in terms of the equities, Exxon, even if it pays us our interest, which we're entitled to, and even if it absorbs its costs, including its letter of credit, is going to benefit to the tune of over $3.8 billion simply by the passage of time while this appeal has played its way out by virtue of the fact that they were able to hold on to the money that was rightfully the plaintiff's in 1996. And even if that $3.8 or $4.4 billion, that's on the $500 million that you got or the $5 billion that you originally got? That's starting with $507 million in 1996 on the date of judgment. They would have made ten times the money? Yes. And as I said, that's laid out in our exhibit, and it's supported by public So in terms of the equities, if this Court wants to start with the equities, we think that's a strong equitable argument that this Court should follow this precedent in other cases. And as Mr. Hacker referred repeatedly to the size of this, the size of this, we think, equitably favors the plaintiffs. I don't think greater return means that, actually. I think what you're looking at here is taking the assets on their balance sheet and the profits, but I'm not sure. Is that what you're? I believe what we're doing is taking the numbers in their SEC filings about the money they make on their own investments within their company at the end of the year, which is fluctuating between 10 and 36 percent on an annual basis. And we've taken those numbers from their SEC filings and laid them out. Right. Investments not profit from. Pardon me? Investments not profit from continuing operations. That's right. If I used that word, I used it wrong. No, I don't think you did. Okay. But even putting that equitable component aside and looking simply at the success here, remember, Judge Kleinfeld, you asked about an offer of judgment as an analogy. Exxon took the position, of course, that it should have to pay zero in punitive damages from the beginning of this case right up until the Supreme Court argument. But in the Ninth Circuit, remember, when we had our appeals, its fallback argument was if we have to pay, we should only have to pay $20 or $25 million. So if you look at how the parties prevailed in terms of going through this circuit as to where the chips were, Exxon can spin the numbers one way and say, well, they got the award cut by 90 percent. From our perspective, Exxon's fallback position was $25 million. We multiplied that by 20 times by defending a judgment, again, that we, as a fiduciary matter, were duty-bound to defend for our clients. So we think there's no reason for this Court to create an internal conflict with its own jurisprudence or to create a conflict with courts outside of this circuit, which, hell, hold time again, that mixed decisions, which, of course, that's what we have here, are ones in the punitive realm, even if the award is significantly reduced, where parties should bear their own costs. Is it correct that they did not make an offer of judgment? Yes. I can't put much stock in how much the plaintiff tells the jury a case is worth or how much the defendant tells the jury it's worth compared to an offer of judgment, but they're just flat out as none there, right? I think Exxon's position from the beginning was they weren't going to settle this case. It only has to be served under Rule 68A. It doesn't have to be filed. So that's why I have to ask. Well, all I can say is I will say what my colleagues have been. I'm not aware of any, and I'm happy to check and see and file something with this Court if there's something that I'm not aware of, but I can. Your opposing counsel seems to agree. I think that's right. And I think for this Court's purposes and understanding. I'm not asking you to check. I was just nailing it down. Of course, of course. Okay. But in using this Court's equitable discretion in the cost realm, remember that it's important to understand it is not a prevailing party test. That is the test under Rule 54. Exxon hasn't cited a single case that decides the cost question is a matter of pure prevailing parties. The one case that cites where it starts its argument is the Baez case from the D.C. Circuit. That's a case where one party prevailed entirely. And, of course, that's a prevailing party situation. But it's an equitable test under all the circumstances, and we think that it's clear there's no reason to deviate from uniform practice in this case. If I might turn to interest, unless the Court has any other further questions about the cost question, we think the interest question is, like the cost question, squarely controlled by precedent in this Court. In Planned Parenthood, this Court considered the question of length as to what to do in a situation where a punitive damage judgment is reduced on appeal and then judgment is later entered in the district court. And this Court squarely held that plaintiffs are entitled to interest dating back to the original date of judgment. Ginsburg. Can I just ask you a question about that? You seem to agree that the interest that you want and that is at issue here is 5.9%? Yes. Is that rounded up from 5.88 or? It may be, Your Honor. I'm not sure. I was looking at the charts and I couldn't find 5.9 anywhere. I'm not certain. To be honest, I'm not certain about the answer to that. Okay. Is there a file? The parties agree on that. And this Court is to be administered by the district court. Is it clear that we use the earlier version of the statute and not the amended version? Yes. Because under Kaiser, this Court holds. The Supreme Court. The Supreme Court, actually. Yes. But Kaiser is important for one other reason. And that is because it says that Section 1961 is the driving force here. Section 1961 kicks in when the evidentiary basis for an award is established and so the damages are meaningfully ascertained. And, of course, that's the situation we have here. We did not have a trial in the United States Supreme Court and present evidence about punitive damages. That trial happened in the district court in Alaska in the 1990s, and that's where the evidentiary basis for this award was established and that's where it stands. And let me say one final thing about Kaiser, because my colleague has suggested this Court has some power to deviate from the 5.9 percent interest rate. With all due respect, this Court doesn't have that power. In Kaiser, the very last section of that opinion, the U.S. Supreme Court made clear that the plain text of Section 1961 selects a single interest rate to be determined by looking at the weekly T-bill rate surrounding the date of judgment, and that has to be a concern. That is a rate that is constant from the date of judgment to the present day. So under Kaiser in the plain language of 1961, there's a single interest rate that this Court needs to apply across the board. If there are no further questions, I'm happy to answer any further questions about our position on interest or costs, or I'm happy to submit the case. Help me find where in Planned Parenthood it speaks to the divisibility of costs issue. Oh, it's in the opinion before the opinion that deals with interest. So in the opinion that's reported at 422F3rd 949. Did you read the language? I'm sorry. I don't have the copy of the opinion before me, Your Honor. But it's the last. It's the very end of the opinion this Court says the parties are to bear their own costs or something of the equivalent. Does it say why or anything, or is it just? No. So we don't actually even know if it was contested or anything? I don't know that it would have been because, at least in the ordinary course of business, I don't know that costs would have been discussed in the appellate briefs debating the size of the punitive award and whether it ought to be reduced. Can you help me ask just for a minute why the Supreme Court, the little, the history of this in the Supreme Court? I didn't quite understand why this is bounced back to us to decide the proceeding. The reason why, Judge Schroeder, is because after we got the Supreme Court's decision suggesting that a one-to-one ratio was appropriate and, therefore, a $507 million judgment was appropriate, we, the question arose whether Supreme Court Rule 42.1, which is the Supreme Court equivalent of Rule 39, I'm sorry, Rule 37, kicked in and was going to require the Court to speak about interest in its mandate. And so to protect ourselves, we asked Exxon whether they would agree that we were entitled to interest or whether we needed to file something to protect ourselves in the Supreme Court. They advised that we ought to file something to protect ourselves. So we filed something in the Supreme Court that said, in the alternative, either fine that Rule 42.1 doesn't present any problem and just send the case back unencumbered, or if you find that 42.1 does apply in the way that this Court has found that Rule 37 applies when it reduces a punitive judgment, that we ought to get our interest. Exxon, I'm sorry. Oh, I'm sorry. Go ahead. Oh, and Exxon took the position that Rule 42 did apply and asked the Court to deny us interest. And I think at that point, with the Court all on summer vacation, not used to deciding this, and I think, frankly, the Court was taken by surprise. I think the Briggs situation is somewhat different than this situation, and the situation where a court orders a judgment money to be recovered for the very first time in litigation. And I think the Court was unexpectedly caught between its rule and its, perhaps, its ordinary practices and just decided to send the case back. Counsel, let me take you back to costs. The Supreme Court knew it was making a split decision. I think they were divided on whether to just throw out the award altogether because of the vicarious liability aspect possible under the instructions, but they were split four to four, so they had to let our two-and-a-half, or rather our liability determination stand. However, regarding costs, they had the same discretion we do. It's worded differently, but they can do whatever they want on costs. And what they said in their mandate is they said the judgment of the above court, that's us, is vacated with costs. And then down below, they award the cost to the penny. And considering our record, I'm a little wary of getting out in front of the Supreme Court and saying we're fairer than they are. I don't think you need to worry about that, Judge Kleinfeld. The Supreme Court rule on costs is quite different than Rule 39. The Supreme Court rule on costs provides that if a judgment is at all disturbed, that is, if it's vacated, reversed, or remanded, that the Petitioner recovers costs. And I think the quite – let's see. I've got the rule here. And what it says is just what you said, but then it has another clause. It says unless the court otherwise orders. Right. And unless the court otherwise orders means they can do whatever they want. Right. But I think that it's important to understand there's two different – even for a starting place, there's two different presumptions in place. The presumption in the Supreme Court is that if the judgment is disturbed at all, then the Petitioner recovers costs. And I think there's good reason for that. If you succeed in being the one in a hundred case that the Supreme Court grants and you get anything out of the court, that it's reasonable to recover costs. And remember, they're very, very small in the U.S. Supreme Court. The only costs you can recover is the filing fee and the cost of printing the briefs. And so this case, which has costs at $14,000 in the Supreme Court, is actually a very, very large cost award as U.S. Supreme Court cost awards go. Now, in contrast, Rule 39 has the opposite presumption. It's presumption in a mixed case. At least it has an opposite presumption in a mixed case. And that presumption is that the parties bear their own costs unless the court orders otherwise. Well, let's see. The difference in the wording that matters here is their rule says, unless the court otherwise orders, and our rule says costs are taxed only as the court orders in the mixed case. Not – it doesn't seem to me much of a difference. Maybe a difference in presumption, but not much of one, because there's a very strong presumption that the winner gets costs anywhere. Well, remember, in the U.S. Supreme Court, if you get a case vacated and remanded, you're not necessarily the winner. There's not a prevailing party rule even there. Again, it's just a default rule that if you are successful, they're very, very rare, rare, rare party to get a court to disturb a judgment. And I think – and we could mince the words, but I think a fair reading of the Supreme Court rules is a presumption that costs are awarded in those circumstances. And, again, they're going to be very small. In this court, under Rule 39, the presumption, I think if it's not in the language, Judge Kleinfeld, I think it certainly is in the cases. Exxon cannot cite a single case where costs have been awarded to a defendant in a mixed-judgment situation like this one. The closest it comes is Republic of Africa. Well, I actually remember it in a case I was on, but it was just not a significant amount of money, and I don't think it was even a published opinion. Usually costs just don't matter much. That's a fair statement, I think. But there are plenty of cases where it might. And the only published opinion that Exxon can cite is Republic Tobacco. That's a Seventh Circuit case where actually in the Seventh Circuit's own opinion it said the parties should bear its own costs. And then, oddly enough, on remand, the district court nonetheless went ahead and awarded costs to the defendant. The Seventh Circuit, as the case came back up, held that it would not disturb the discretion of the trial court, which is an odd ruling in that even Exxon, at page 6 of its own brief, acknowledges that this court is the only court that can award costs to Exxon. Let's say, hypothetically, that the Supreme Court, instead of cutting your $5 billion, had cut it to $500 million, had cut it to $1. They said, well, they're entitled to nominal punitive damages. I can't think of a theory right off the bat. But let's say they've done that. You'd still be the prevailing party entitled to costs? Fisherman. Well, we're not saying that we're the prevailing party. We're saying it's a mixed result. Kagan. But we think that this Court could have, under its discretionary decision under subsection E, find that the parties should nonetheless bear their own costs. But I do. But the right thing to do in that case, if they cut it down from $5 billion to $1, would be no costs? I think you could do that. I think that in an extraordinarily extreme situation like that, you might be able to award costs to the defendant. But where do you draw the line? I mean, you're not at the $1. You're not at a nominal amount. But $500 million. Well, I'm happy to draw the line where this Court draws it. I'm sorry. I'm happy to draw the line where this Court draws it in its own precedent. Southern Union is a 98% reduction. Planned Parenthood is a 94% reduction. It's not nominal. Gaines was an over 90% reduction. And then just viewing the number in raw terms, it is one of the, we believe it's the fourth largest punitive damage verdict ever upheld in a Federal. Are there any where it was contested? I'm sorry? Are there any of those no costs, considerable, great reduction where it was contested and the Court discussed it? I believe in the three cases I just cited to you from this Court, they're all at the end of the opinion. And so I can certainly say there isn't extensive consideration. But we submit that doesn't show that it doesn't matter. It's just that it's so routine and easy that this Court has a custom that it follows. And just because there's a lot of money and a well-financed set of briefs on the other side of this case, this Court shouldn't deviate from that typical practice. Thank you. Thank you. Just on the internal rate of return point, Your Honors, I don't know if this came out in the briefs. That's an average rate across all of Exxon's capital, and it's a risk-adjusted rate. There were a lot of dry holes that were drilled. This is marginal dollars. It has nothing to do whatsoever with the overall internal rate of return. And on the Kaiser question, Kaiser held that 1961 applies because that was a judgment. Kaiser held is you couldn't apply interest going back to an earlier verdict, but to the judgment. And 1961 did apply by its own terms. And, of course, the 1961 rate applied under those circumstances. Here we're talking about applying interest to a judgment to which 1961 does not apply by its own terms. Thank you very much. Thank you. The matter just argued is submitted for decision. And that concludes the Court's calendar. The Court stands adjourned. Thank you.
judges: Schroeder, Kleinfeld, Thomas